# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

ILIAMNA LAKESHORE
CONDOMINIUMS, LLC,

Debtor.

Case No. A10-00440-DMD
Chapter 11

**Filed On 8/25/10**

## MEMORANDUM ON BAD FAITH STAY RELIEF

The debtor filed for Chapter 11 relief on May 25, 2010.[1] Iliamna Lodge, LLC ("Iliamna Lodge"), the holder of the first deed of trust on the debtor's real property, filed for relief from stay on June 4, 2010. A preliminary hearing on the motion was held on June 30, 2010. An order granting relief from stay was entered on July 9, 2010.[2] The debtor filed a motion for reconsideration on July 14, 2010.[3] In my absence from this District, and with the parties' consent, Judge Ross held a hearing on the motion for reconsideration on July 19, 2010. Judge Ross granted the motion for reconsideration on July 20, 2010, and scheduled a final hearing on the motion for relief from stay for August 6, 2010, before me.[4] The order directed the debtor to obtain fire and liability insurance by July 23, 2010, but contained no drop dead provision. The debtor obtained insurance for the real property on August 5, 2010. Because

---

[1] Petition, filed May 25, 2010 (Docket No. 1).

[2] Order Granting Mot. for Relief From Stay and Denying Mot. to Sell Property, entered Jul. 9, 2010 (Docket No. 40).

[3] Mot. to Reimpose Automatic Stay and to Reconsider Order Denying Mot. to Sell, filed Jul. 14, 2010 (Docket No. 44).

[4] Order Reimposing Stay, Setting Hearing, Granting Use of Cash Collateral, and Other Relief, entered Jul. 20, 2010 (Docket No. 58).

the debtor had acquired insurance, the primary issue before me at the final relief from stay hearing on August 6, 2010, was whether Iliamna Lodge was entitled to relief from stay on the ground of bad faith filing. I conclude that this creditor is entitled to such relief.

History of the Debtor

In 1985, Japanese business interests constructed seven four-plex structures on the shoreline of Lake Iliamna ("the project"). The setting is beautiful but remote, accessible only by air. According to the debtor's sole member, William Campbell, the cost to build this project was $4.3 million. The units in the project were to be sold as time-share condominiums,[5] but the sales never materialized. Campbell owned a limited liability company, Alaska Wildlife Properties, LLC ("AWP"), which purchased the project in 1996 for $650,000.00. Campbell was the sole member and managing member of AWP until 2004.

Gregory Ellis made a capital contribution of $50,000.00 to AWP on February 25, 2004, and acquired a 50% interest in AWP effective May 27, 2004.[6] Ellis became a managing member of AWP.[7] The same day that Ellis became a managing member, he loaned AWP the

---

[5] The legal description to the property identifies the four-plexes as an "Interval Ownership Condominium." *See* Decl. of William A. Campbell, filed Jun. 21, 2010 (Docket No. 28), Ex. D.

[6] Debtor's Mem. re: Alaska Wildlife Operating Agreement, filed Aug. 9, 2010 (Docket No. 69), Ex. A at 1. The debtor's copies of the documentation evidencing this transaction, consisting of a contribution agreement, certificate and authorization, and amendment to the AWP Operating Agreement, show the signatures of Campbell only. The debtor says these documents were prepared by Ellis's attorney, but doesn't know if Ellis ever signed them. Debtor's Mem. (Docket No. 69), at 1.

[7] *Id.*, Exs. A, B. The debtor disputes this. It contends Campbell was the only managing member of AWP and had full authority to transfer AWP's assets to the debtor. This issue will be discussed more fully below.

sum of $234,246.00.[8]  This loan was secured by a deed of trust on the project.[9]  The loan was payable in full within three months, but AWP never made any payments on it.  To pay off the loan, Campbell and Ellis attempted to sell the project in 2008, without success.

Ellis needed money.  He executed a promissory note purchase agreement on August 31, 2009, to sell the loan to "Gregg Jeffries and/or assigns" for $225,000.00.[10]  In this documentation, Ellis represented that the outstanding balance on the loan was $475,437.16.[11]  Ellis was given the right to repurchase the note within 120 days for the sum of $450,000.00.[12]  The promissory note purchase agreement was amended on September 3, 2009.[13]  Gregg Jeffries was a member of Iliamna Lodge.[14]  With Ellis's consent, Jeffries assigned all of his right, title and interest in the agreement to Iliamna Lodge, and Iliamna Lodge assumed all of Jeffries's rights and obligations thereunder.  Contemporaneously with this agreement, Ellis executed an assignment of deed of trust, transferring his security interest in the project to Iliamna Lodge.[15]

---

[8] Iliamna Lodge's Mot. for Relief From Stay, filed Jun. 4, 2010 (Docket No. 12), Ex. 1.

[9] *Id.*, Ex. 2.

[10] Wilson's Pre-Hearing Brief, filed Aug. 5, 2010 (Docket No. 64), Ex. A.

[11] *Id.*, Ex. A at 1, 4.

[12] *Id.*, Ex. A at 4, ¶ 2.

[13] *Id.*, Ex. A at 3.

[14] Wilson's Pre-Hearing Brief (Docket No. 64), Ex. A at 3.

[15] Iliamna Lodge's Mot. for Relief From Stay (Docket No. 12), Ex. 3.

When Iliamna Lodge purchased the note, AWP was no longer a corporation in good standing. AWP was involuntarily dissolved by the State of Alaska on April 16, 2007, and did not apply for reinstatement within the two year time limit set by Alaska Statute.[16] Given AWP's status, Campbell and his attorneys, Kneeland Taylor and Cabot Christianson, contacted Ellis about quit-claiming his interest in AWP to a new debtor and signing a declaration. The plan was that Campbell and Ellis would create this new entity to resurrect AWP's interest in the project. Ellis responded erratically. He first indicated that he would go along with this plan, but then waffled. At the hearing on August 6, 2010, Ellis testified that the individual who had initially purchased his note, Gregg Jefferies, had threatened to sue him. Ellis also said he was upset by draws Campbell had taken from AWP. He became aware of the draws after speaking with his accountant in the fall of 2009.

After the note was transferred to Iliamna Lodge in September of 2009, Campbell and Ellis tried to raise the money to repurchase it, without success. In February, 2010, Iliamna Lodge initiated a non-judicial foreclosure on the note. The foreclosure sale was scheduled for May 27, 2010.[17] With time running out, on May 21, 2010, Taylor and Christianson advised Campbell to sign a quit-claim deed from AWP to a new entity, Iliamna Lakeshore Condominiums, LLC. Campbell complied. The newly created entity then filed for chapter 11 relief on May 25, 2010, just two days before the scheduled foreclosure.

---

[16] A.S. 10.50.408(e).

[17] Wilson's Notice of Filing Additional Ex. to Opp'n to Mot. for Relief From Stay, filed Jun. 30, 2010 (Docket No. 33), Ex. B.

4

The project is the only major asset of the debtor. Two deeds of trust encumber it: a first deed of trust to Iliamna Lodge, with a scheduled claim of $402,826.00, and a second deed of trust held by Mark Wilson ("Ice Hole, LLC"), with a scheduled claim of $389,758.69.[18] Neither claim is scheduled as "disputed."[19] The debtor has no scheduled priority claims, and lists just six general unsecured creditors, with claims totaling $253,603.80.[20] Three of these creditors – Campbell, Ellis and Campbell's attorney Mr. Taylor – are insiders holding claims totaling $113,890.00.[21]

The debtor's statement of financial affairs reflects that rental income from the project was $58,000.00 in 2008 and fell to $38,000.00 in 2009.[22] This decline in rental income mirrors the decline in the overall economy during the same period. At the time the chapter 11 was filed, only two of the 28 units in the project had tenants, as a result of a rental agreement with the Federal Aviation Administration ("FAA"). The rental agreement expires in October. The rent is barely sufficient to cover insurance on the project. Many of the units in the project need repairs, and one of the four-plexes has been "cannibalized" to provide parts and materials to repair other units.

Discussion

---

[18] Debtor's Schedules, filed Jun. 8, 2010 (Docket No. 15), Sched. D.

[19] *Id.*

[20] *Id.*, Sched. E, F.

[21] *Id.*, Sched. F.

[22] Statement of Fin. Affairs, filed Jun. 8, 2010 (Docket No. 16), at 1.

5

"The debtor's lack of good faith in filing a bankruptcy petition has often been used as cause for removing the automatic stay."[23] In the Ninth Circuit, "[t]he existence of good faith depends on an amalgam of factors and not upon a specific fact."[24] "The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."[25] A debtor's subjective intent is not determinative in making a finding of bad faith; rather, the court looks to "several, distinct equitable limitations that courts have placed on Chapter 11 filings" and, in instances where a debtor has resorted to chapter 11 "for a variety of tactical reasons not related to reorganization," cause for relief can be found.[26]

Iliamna Lodge contends the transfer of AWP's assets to a newly created entity which filed chapter 11 on the eve of its scheduled foreclosure sale constitutes bad faith and is cause for granting relief from stay under 11 U.S.C. § 362(d)(1). A number of new debtor cases generally support this argument. These include *Meadowbrook Investors' Group v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*,[27] *Duvar Apt., Inc. v. F.D.I.C. (In re Duvar Apt., Inc.)*,[28]

---

[23] *Idaho Dept. of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986); *see also Duvar Apt., Inc. v. F.D.I.C. (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996).

[24] *Arnold*, 806 F.2d at 939.

[25] *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (discussing bad faith in the context of a motion to dismiss "for cause" under 11 U.S.C. § 1112(b)). The "for cause" determination of bad faith is the same under § 1112(b) and § 362(d)(1). *Laguna Assoc. Ltd. P'ship v. Aetna Cas. and Sur. Co. (In re Laguna Assoc. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994).

[26] *Marsch*, 36 F.3d at 828 (citations omitted) (discussing bad faith as cause for dismissal § 1112(b)).

[27] 30 B.R. 503 (B.A.P. 9th Cir. 1983).

[28] 205 B.R. 196 (B.A.P. 9th Cir. 1996).

and *Laguna Associates Limited Partnership v. Aetna Casualty and Surety Co., (In re Laguna Associates Limited Partnership).*[29] As the Ninth Circuit Bankruptcy Appellate Panel ("BAP") noted in *Thirtieth Place*, the determination of good faith depends upon the facts and circumstances present in a given case and that "[n]o one evidentiary fact can be given paramount weight in deciding the question."[30]

> If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses . . . to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy, efficient reorganization, upon a feasible basis . . . good faith cannot be denied.[31]

In *Thirtieth Place*, the BAP found that the transfer of assets to a new debtor just prior to filing for chapter 11 relief gave rise to a finding of bad faith. Two individuals had invested in a townhouse condominium project located in Phoenix. When they failed to make a $165,000.00 payment to the joint venture which had been formed for the purpose of investing in the project, the joint venture commenced a foreclosure proceeding against their interests. The two individuals obtained a temporary restraining order from the state court to prevent the sale, but the order was conditioned upon the posting of a $200,000.00 bond. The two investors

---

[29] 30 F.3d 734 (6th Cir. 1994).

[30] *Thirtieth Place*, 30 B.R. at 505.

[31] *Id.*, citing *Matter of Levinsky*, 23 B.R. 210, 218 (Bankr. N.Y. 1982).

7

didn't post the bond. Instead, they formed a new corporation, quitclaimed their interests in the Phoenix property to it, and placed the new corporation into chapter 11. The Arizona Corporation Commission withheld approval of the new corporate entity because its proposed name was too similar to an existing Arizona corporation. The two investors caused the new corporation to quitclaim its interest in the Phoenix project to a second newly formed corporation, Thirtieth Place, Inc., and placed this new entity into chapter 11 as well.

The joint venture moved to dismiss both of the bankruptcies on the grounds of bad faith. The bankruptcy court dismissed the first chapter 11 petition as a bad faith filing. However, a different bankruptcy judge in the same district considered the motion in the Thirtieth Place bankruptcy and denied it. The joint venture appealed this decision to the BAP, which found that the second petition was also a bad faith filing and reversed. The BAP stated:

> Although the proximity of the debtor's formation to the date of the petition, by itself, does not indicate an intent to abuse the Code's reorganization provisions, persuasive evidence of bad faith accumulates upon a close scrutiny of the circumstances giving rise to the creation of Thirtieth Place, Inc.
>
> The conveyance of the subject real property, the sole asset of the debtor, was necessary for its creation and the filing of its petition for reorganization. The predominant purpose in filing the petition was to prevent foreclosure upon the heavily encumbered property. It must be noted that there was no plan contemplated for the infusion of capital, no gain in managerial expertise, no history of past business conduct, no employees and indeed, no current business activity on the date of the commencement

8

>of the case nor are there any reasonable prospects for the conduct of future business. In short, the debtor was created for the sole purpose of obtaining protection under the automatic stay by filing bankruptcy.[32]

As in *Thirtieth Place*, the conveyance of the project to the debtor here was necessary for its creation and the filing of the petition. The project is the only major asset of the debtor's. The project is heavily encumbered; there are two deeds of trust on it that exceed $800,000.00. There is no plan for the infusion of capital. Instead, the plan is to sell the units in the project as condominiums. Several of the units are in a state of disrepair. Further, as noted by Iliamna Lodge, condominium projects have certain requirements found in AS 34.08 which must be satisfied before units can be sold as condominiums.[33] Those requirements haven't been met here, and sales would be delayed pending compliance.

There is no gain in managerial expertise, nor does this debtor have a history of past business conduct. Its current business activity is minimal, consisting of the FAA's rental of two units, and this tenancy will terminate in October. The debtor has never rented units in the project over the winter months. They are mothballed for the season. The debtor has no employees.

The foreclosure proceeding initiated by Iliamna Lodge is the fourth that has been commenced against the project. This chapter 11 case has delayed Iliamna Lodge's foreclosure. Delay alone does not constitute bad faith, but it is one of many factors that can be added when

---

[32] *Thirtieth Place*, 30 B.R. at 505-06.

[33] Iliamna Lodge's Opp'n to Blanket Mot. to Sell Condominiums, filed Jun. 29, 2010 (Docket No. 30), at 7.

9

considering whether bad faith is present.[34] And there are other factors here which are similar to those found in *Thirtieth Place*. The BAP said its bad faith finding was "further bolstered" by the two investors' inability to obtain the $200,000.00 bond required by the state court.[35] Here, AWP has been unable for years, literally, to repay the obligations on the project. Ellis never received a single payment on the loan he extended to AWP in 2004. After Campbell and Ellis tried to sell the property in 2008 without success, Ellis resorted to selling his note to Iliamna Lodge because he needed money. Campbell and Ellis tried to repurchase the note after it was sold to Iliamna Lodge but, again, they were unsuccessful. AWP has never generated sufficient income to cover its debt service, let alone maintain the project.

In *Duvar Apt., Inc. v. F.D.I.C. (In re Duvar Apt., Inc.)*,[36] the BAP affirmed a lower court decision granting relief from stay to a creditor based on the "new debtor syndrome."

> Indicia of the new debtor syndrome include: (1) transfer of distressed property into a newly created corporation; (2) transfer occurring within a close proximity to the bankruptcy filing; (3) transfer for no consideration; (4) the debtor has no assets other than the recently transferred property; (5) the debtor has no or minimal unsecured debt; (6) the debtor has no employees and no ongoing business; and (7) the debtor has no

---

[34] *Thirtieth Place*, 30 B.R. at 506.

[35] *Id.*

[36] 205 B.R. 196 (B.A.P. 9th Cir. 1996).

10

> means, other than the transferred property, to service the debt on the property.[37]

Factors 1, 2, 3, 4 and 7 are present here as well. Although the debtor does have $253,803.80 in unsecured debt, three of the six unsecured creditors are insiders holding $113,890.00 of this total. The debtor has no employees, but does have a bit of ongoing business – the FAA's rental of two units which will end in October. The project is the only means by which the debtor can service its secured debt.

I discussed the Sixth Circuit's decision, *Laguna Associates Limited Partnership v. Aetna Casualty and Surety Company (In re Laguna Associates Limited Partnership)*,[38] in my earlier Memorandum on Automatic Stay and Proposed Sale.[39] The debtor has argued that its situation is distinguishable from the one found in *Laguna Associates*. It is true that there are some differences between the facts of that case and the debtor's. But bad faith is determined on the facts and circumstances present in each case, and there are more similarities between this case and the three discussed above than differences. Further, there is an additional, key factor in the bad faith determination here: whether Campbell's unilateral transfer of AWP's assets to the debtor was authorized by Alaska Statute or the AWP operating agreement. Iliamna Lodge argues that Campbell had no authority under either to transfer the project without Ellis's consent. The debtor contends Iliamna Lodge cannot raise this argument

---

[37] *Duvar Apt.*, 205 B.R. at 200, *citing In re Yukon Enter., Inc.*, 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984).

[38] 30 F. 3d 734 (6th Cir. 1994).

[39] Docket No. 40, entered Jul. 9, 2010.

11

because it is a creditor rather than a member of AWP. However, I feel this analysis is relevant because it bears on the issue of good faith.

Good faith is determined by applying an objective standard rather than examining the debtor's subjective intent.[40] I analyze the issue of Campbell's conveyance of AWP assets to the debtor with this in mind. Campbell acted upon advice of counsel here. He acted with the intent to protect his and Ellis's interest in the project and lacked subjective "bad faith." However, upon examination of the AWP operating agreement and the applicable Alaska statutes, I conclude Iliamna Lodge is right. There was no authority for Campbell to unilaterally convey AWP's assets to the debtor without Ellis's consent.

The propriety of Campbell's actions is based on the premise that he was the only managing member of AWP. This premise is contradicted by various documents Campbell executed in 2004 which made Ellis a managing member of AWP as well.[41] The debtor says it's not sure if Ellis also executed these documents. Ellis's signature is immaterial. Article IX, Paragraph 2 of the AWP operating agreement provided that additional members could be admitted to the LLC by unanimous vote of the existing members.[42] Campbell was the only member and managing member of AWP at the time he executed these documents. His was the

---

[40] *Marsch*, 36 F.3d at 828.

[41] Debtor's Mem. re: Alaska Wildlife Operating Agreement, filed Aug. 9, 2010 (Docket No. 69), Exs. A and B.

[42] Debtor's Supp'l Mem. re: Continuation of the Automatic Stay, filed Aug. 5, 2010 (Docket No. 63), Ex. E at 10.

12

only vote needed to accomplish the action. It is clear from Campbell's signature on the documents that he agreed to add Ellis to AWP both as a member and managing member.

The debtor argues that Campbell nonetheless had the authority to convey AWP's assets to it under the AWP operating agreement or Alaska Statute. I disagree. A.S. 10.50.415(3) allows a person winding up the affairs of a limited liability company to dispose of and transfer company property, "unless otherwise provided in an operating agreement of the company."[43] This statute doesn't apply here because the AWP operating agreement clearly provides otherwise. The operating agreement has a number of restrictions on the management of the company. Article V.1 of the agreement prohibits managing members from selling or transferring AWP real property with a value of over $10,000.00 "without the prior written consent of all non-managing Members."[44] Further, the managing members are to make decisions "by majority vote on the basis of their Percentage Interests."[45] Ellis was a managing member with a 50% interest in AWP and his vote was required before Campbell could convey the project. The AWP operating agreement goes on to provide:

> Subject to section V.1 of the Agreement, all transactions, agreements and business of the Company require unanimous approval of the Managing Members and the agents of the Company. It is expressly provided that *no single Member Manager has the power,* on behalf of the Company, to do any and all things necessary or

---

[43] AS 10.50.415(3).

[44] Debtor's Supp'l Mem. re: Continuation of the Automatic Stay, filed Aug. 5, 2010 (Docket No. 63), Ex. E at 5.

[45] *Id.*

13

>   convenient to carry out the business and affairs of the Company. All actions require a unanimous vote of the Member Managers and the agent of the Company.[46]

The debtor contends Article X of AWP's operating agreement, entitled "Dissolution and Winding Up,"[47] overrides these provisions and gave Campbell the authority to convey the project to the debtor. There is no provision in Article X that permits one managing member to unilaterally transfer the assets of AWP to a new entity. Instead, this article provides that the LLC would be dissolved and its affairs wound up upon the occurrence of certain events. One of these events is "the unanimous written consent of all the Managing Members."[48] I conclude that Campbell's transfer of the project to the debtor was not authorized by Alaska statute or AWP's operating agreement.

The debtor argues that there is significant equity in the property and that Iliamna Lodge hasn't met its burden of proof on this issue, as required under 11 U.S.C. § 362(g)(1). As bad faith is cause for granting relief from stay under § 362(d)(1), the court is not required to consider whether there is equity in the property,[49] or if there is a feasible chance of

---

[46] *Id.*, Ex. E at 5, ¶ V.2 (emphasis added).

[47] Debtor's Supp'l Mem. re: Continuation of the Automatic Stay, filed Aug. 5, 2010 (Docket No. 63), Ex. E at 10.

[48] *Id.*, Ex. E at 10, ¶ 1.7.

[49] The provisions of § 362 (d)(1) and (d)(2) are disjunctive; a creditor needs to prove entitlement to relief under one section or the other, but not both. *Sun Valley Ranches Inc., v. Equitable Life Assurance Soc'y (In re Sun Valley Ranches, Inc.),* 823 F.2d 1373, 1376 (9th Cir. 1987); *see also Duvar Apt., Inc.*, 205 B.R. at 200.

14

reorganization.[50] However, both factors will be considered here as they also have a bearing on the bad faith determination. Campbell testified that the project is worth $1.8 million. It is 25 years old, however, and needs considerable maintenance. Both Campbell and Ellis say they have put in several hundred thousand dollars' worth of sweat equity to maintain the project over the last several years. Yet much more work is needed. One of the four-plexes has been cannibalized to provide parts and materials to repair other units. The property didn't sell in 2008 when it was listed for $1.8 million. Further, there are certain legal formalities which may need to be satisfied before the project can be sold as condominiums. Right now, it is designated as an interval ownership condominium, or timeshare.

I think Campbell is extremely unrealistic in his valuation. The project is in poor condition in a remote part of Alaska. None of the more "civilized" services found in a city are located there. The units weren't successful as timeshare condominiums, and there is no indication that they will fare any better as residential condominiums. I will value the property at $1.1 million for purposes of the present motion.[51] Iliamna Lodge is owed between $475,000.00 and $725,000.00 on the first deed of trust, depending on how the default interest on the note is calculated. The balance on the second deed of trust held by Mark Wilson is nearly $400,000.00. Under a best case scenario, there may be equity of $225,000.00 in the project. But if this case remains in chapter 11, this equity would be consumed by

---

[50] *Duvar Apt., Inc.*, 205 B.R. at 201-202.

[51] This valuation is based on the last appraisal done on the project, in 2006. The debtor did present a broker's opinion of value but it was not considered at the hearing because the broker was not available for cross-examination.

15

administrative expenses, including the expense of bringing the project into conformity with the legal requirements for the sale of residential condominiums, and the transactional costs involved in selling the units. Further, as the debtor has recognized, it may need to offer self-financing in order to rapidly close the sales.[52] Interest on the Iliamna Lodge and Wilson deeds of trust would continue to accrue while the project is marketed and any notes to the debtor are paid over time, further eating into the project's equity. The benefit to general unsecured creditors in this chapter 11 is illusory.

Finally, I feel the reorganization prospects of the debtor are dim. This is a one-asset case having secured creditors with substantial claims. The debtor has no employees and very little ongoing business. The seasonal rental payments generated by the project will barely cover insurance premiums. The project has never generated enough income to cover its secured debt. The project didn't succeed as a timeshare nor did it sell in 2008. Substantial work would have to be done to make many of the units saleable as condominiums. If the units were sold "as is," it is unlikely that the proceeds would be sufficient to cover the two secured debts on the project, let alone pay the general unsecured creditors in this case. The debtor has no capital for repairs and Campbell appears to be tapped out. His optimism for this project is quixotic.

> A creditor can establish a prima facie case
> of bad faith filing by showing the transfer of

---

[52] In fact, the debtor has now filed a motion to sell one of the units in the project for $69,000.00 with a downpayment of $6,000.00 and the balance financed over 15 years at 7% per annum. Mot. for Authority to Sell Condominium Unit 4, Building B Free and Clear of Liens, and to Pay Commission and Closing Costs, filed Aug. 24, 2010 (Docket No. 75).

> distressed property to the debtor within close proximity to the bankruptcy filing. Once a prima facie case is established, the burden shifts to the debtor to demonstrate a good faith business reason for the transfer and the filing. . . . [A] court can consider delay coupled with other bad faith factors in determining the harm to a particular creditor. The fact that the creditor's rights have not been adversely affected is not sufficient for the debtor to overcome the presumption of bad faith.[53]

I find that Iliamna Lodge has established a prima facie case of bad faith filing. The debtor's petition was filed on the eve of foreclosure. The debtor argues that it had a good faith business reason for the transfer of AWP assets to it and its subsequent chapter 11 filing. Given that the transfer was accomplished in violation of the provisions in the AWP operating agreement, good faith cannot be found here. This chapter 11 filing has delayed Iliamna Lodge's foreclosure sale, and there are other factors here which are indicative of bad faith.

This case is not so dissimilar from the other new debtor cases which are discussed above. There is a common thread in these cases that goes beyond the obvious similarities, *e.g.*, a new debtor is formed, receives assets and files chapter 11 on the eve of a foreclosure. It's the rationale behind this conduct that justifies a bad faith finding. Ultimately, the new debtor was created as a procedural tactic to buy time or to circumvent state law or contractual requirements, rather than as a realistic effort to effect a speedy, efficient reorganization. In *Thirtieth Place*, the new debtor was created, and real property conveyed to it, after two

---

[53] *Duvar Apt.*, 205 B.R. at 200-01 (citations omitted).

17

individuals were directed to post a bond in order to stay a foreclosure.[54] In *Duvar Apartment*, the owner of a distressed apartment building caused a new corporate debtor to be created and placed in chapter 11 in an effort to protect his credit rating and equity in the property and to avoid a possible violation of his probation for housing code violations.[55] In *Laguna Associates*, a new debtor was created on the eve of foreclosure to hold property which had been transferred in violation of a loan agreement.[56] Here, we have the transfer of AWP assets in violation of the operating agreement and creation of a new debtor on the eve of foreclosure. Other facts and circumstances present here are also indicative of bad faith.

Iliamna Lodge's motion for relief from stay is meritorious. For the reasons stated above, relief from stay will be granted for cause under 11 U.S.C. § 362(d)(1), on the ground of bad faith filing. An order and judgment will be entered consistent with this memorandum.

DATED: August 25, 2010

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve: C. Christianson, Esq.
D. Bundy, Esq.
M. Melchert, Esq.
U. S. Trustee

08/25/10

---

[54] *Thirtieth Place*, 30 B.R. at 504.

[55] *Duvar Apt.*, 205 B.R. at 201.

[56] *Laguna Assoc.*, 30 F.3d at 736.